■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v LUCIA GUADALUPE, Appellant.—Appeal by the defendant from a judgment of the Supreme Court, Queens County (Zelman, J.), rendered May 24, 1984, convicting her of manslaughter in the first degree and criminal possession of a weapon in the second degree, upon a jury verdict, and imposing sentence.

Judgment reversed, on the law and as a matter of discretion in the interest of justice, and new trial ordered.

The improper admission of prejudicial evidence, compounded by the erroneous exclusion of proper testimony, created a "significant probability * * * that the jury would have acquitted the defendant had it not been for the error[s]" *(see, People v Crimmins,* 36 NY2d 230, 242).

The defendant, who was born in Puerto Rico, moved to the United States as a young woman of 17. Although she received

only a ninth-grade education, the defendant has worked to support herself and her children. She was married in 1979 to Feliciano Guadalupe, who was killed in 1981. The defendant testified that a few months after her husband's death she met the decedent, who introduced himself to her as Pedro Acevedo, although he employed various names, including his legal name, Hector Luis Maldonado, and "Joe", as he was known to his neighbors. When they met, Acevedo told the defendant that he had just arrived from Puerto Rico, and had no place to live; she invited him to move in with her and the children, and he lived with her for the next two years. Acevedo at first presented himself as a "nice" and "decent" person, but after some time with the defendant and her children his behavior changed.

Acevedo owned samurai swords, machetes, and an axe, which were admitted into evidence, all of which, by the testimony of the defendant and her children, Acevedo used to threaten them. Acevedo also engaged in sexually perverse activity, some of which was inflicted on the defendant's children. He took pictures of himself masturbating; these photos were admitted in evidence. He walked around the house naked, and masturbated on the children at night while they were in bed, not always asleep. The defendant's 12-year-old daughter Vanessa also testified that Acevedo made sexual advances toward her. The defendant and her children testified that they had repeatedly called the police regarding Acevedo's threats, and that on a number of occasions they temporarily left their house, and had also permanently moved to try to avoid Acevedo.

The day the defendant shot Acevedo, he had allegedly attempted to rape the defendant's daughter Vanessa; Vanessa called her mother at work and told her what had happened. When the defendant came home she told Vanessa that when Acevedo went to take a shower they would call the police.

When Acevedo got home that evening, he kicked in the door, breaking the chain, and demanded dinner; while he ate what was served him, he repeatedly asked the defendant whether Vanessa told her anything. He demanded a soda, continuing to curse at the defendant. He then threw a glass at her, which hit the wall and broke. Both the defendant and her daughter testified that Acevedo then grabbed the defendant by the hair and put a knife to her throat, threatening to cut her head off. Both said the defendant, struggling, managed to kick Acevedo in the groin, causing him to step away and bend over.

The defendant then took a gun she had hidden under the cushions of her couch and shot Acevedo.

Acevedo died of one gunshot wound, which passed through his chest, lung, diaphragm, stomach, and liver. The defendant was charged with manslaughter in the first degree, intentionally causing the death of another while acting under the influence of extreme emotional disturbance (see, Penal Law § 125.20 [2]).

The defense was entirely one of justification. Thus it was crucial for the defense to show that the defendant reasonably believed Acevedo was about to use deadly force on her (Penal Law § 35.15 [2] [a]), and the defendant's state of mind was relevant to the issue. Direct examination of the defendant was too heavily circumscribed to permit a full exploration of the issue, since counsel was twice precluded from asking: "What thoughts ran through your mind when you shot him?" The trial court erroneously sustained objections to those questions (cf. People v Rivera, 101 AD2d 981, 982, affd 65 NY2d 661; see also, People v Levan, 295 NY 26, 33-34).

The trial court further erred when it permitted the prosecutrix to introduce into evidence, in its entirety, a letter written by the defendant to the deceased. Among the many statements made in this multipage document were two statements focused upon by the prosecutrix.

The first statement indicated that the defendant had been acquainted with Acevedo for four years rather than two years, as she had testified. While that portion of the letter was indeed inconsistent with the defendant's testimony, impeachment of the defendant with that letter was improper because its use constituted contradiction of the witness on a collateral matter with extrinsic evidence, otherwise inadmissible (see, People v Schwartzman, 24 NY2d 241, 245, cert denied 396 US 846).

Nor was the letter independently admissible on the basis of the other focused-upon statement. In the letter the defendant indicated that both she and Acevedo could be sent to jail for some unspecified act: "go ahead and talk * * * I don't care if I go to jail, but you are going there too".

Cross-examination of a defendant about prior criminal or dishonest acts having a bearing on her credibility is permissible if the prosecutor acts in good faith and has a reasonable basis in fact (see, People v Kass, 25 NY2d 123, 126). However, the statement contained in the letter was too vague to constitute proof of any act. Moreover, even if cross-examination on

that statement were proper on the issue of the defendant's credibility, its actual use was improper in that the prosecutrix attempted to thereby prove the defendant's propensity to commit homicides (see, People v Huth, 92 AD2d 778, 789). The tenor of the cross-examination made it clear that the prosecutrix was suggesting that the defendant and Acevedo had together done something illegal in relation to the death of the defendant's late husband, and had possibly killed him. In fact, the trial court noted that such had been strongly implied.

Information that the defendant had given her maiden name rather than her married name when applying for her late husband's pension benefits, offered by the prosecutrix as a good-faith basis upon which to question the defendant concerning the circumstances of her husband's death, constitutes no basis at all. The cross-examination of the defendant regarding the circumstances of her late husband's death, ostensibly based on the prosecutrix's assertion that there was a possibility that the defendant had been defrauding the Government, combined with the contents of the letter, subtly suggested that the defendant was involved in the death of her late husband.

Particularly since the vague "admission" contained in the letter was employed by the prosecutrix to suggest commission of an unprovable, unelaborated, and uncharged homicide, the letter was highly prejudicial, and virtually guaranteed speculation on the part of the jury. Considering its very limited probative value, the letter should have been excluded (see, People v Simpson, 109 AD2d 461, lv granted 66 NY2d 924; appeal dismissed 67 NY2d 1026).

The error seriously and prejudicially undermined the defendant's justification defense, which, if accepted, would have required an acquittal of manslaughter and called into question whether the defendant possessed the gun with an intent to use it unlawfully. Accordingly, a new trial is required. Weinstein, J. P., Niehoff, Lawrence and Kooper, JJ., concur.