THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* MICHAEL BILANCHUK, Appellant.

First Department, May 6, 1952.

*Louis Kaye* of counsel (*Harry Silver* with him on the brief; *Charles Forster,* attorney), for appellant.

*Charles W. Manning* of counsel (*Frank S. Hogan, District Attorney*), for respondent.

COHN, J. Defendant was tried upon an indictment which contained four counts. The first three charged assault with a loaded pistol. The fourth accused defendant of assault in the second degree by the use of a " billy ". The jury acquitted defendant of the first and fourth counts, but adjudged him guilty only of the third count. The second count had been withdrawn from the jury.

On the day of the alleged assault, March 1, 1949, defendant had been for almost twenty years a member of the uniformed police force of the city of New York. Because of claimed illness, he was absent from duty on sick leave; he was not in uniform, but as required by the rules of the department had in his possession a revolver. He also carried a blackjack. At about three o'clock in the morning, while he was in a bar and grill, an argument arose among several of the patrons in which the complaining witness, Philip Lyman, a sailor in uniform intervened. According to the testimony of witnesses for the prosecution, defendant, in the course of the dispute struck complainant over the left eye with his blackjack. The sailor retaliated by striking defendant several blows with his fist. Defendant thereupon left the premises and a few minutes later Lyman followed. Upon reaching the street, he was shot twice by defendant who lay in wait for him just outside the barroom, one bullet causing a flesh wound of the abdomen and the other penetrating the left buttock. Lyman grappled with defendant for possession of the gun and succeeded in seizing the hand of defendant which held the revolver. He pulled

defendant's trigger finger and thus emptied the gun. Other persons who had been in the bar, on hearing the shooting, came out into the street and several, joining Lyman, set upon the defendant and gave him a severe beating.

A somewhat different story of the fracas was told by defendant. He swore that in the barroom the complaining witness intruded himself into a discussion between defendant and two of his friends; that Lyman, angered at a remark made by defendant, struck him; and that others joined in the assault upon defendant; that he did not strike complainant with a blackjack; that he managed to escape to the street, where he went to obtain assistance for the purpose of arresting Lyman; that Lyman and several others followed him out immediately and pounced upon him, beating him up; and that while Lyman was grappling with him, defendant fired two shots " in the gutter " to attract the attention of others so that he might obtain aid in procuring Lyman's arrest; that at no time did he intend to shoot at Lyman; that his sole purpose in firing the gun was to obtain assistance.

Gunpowder marks on Lyman's buttocks indicated that the gun, when fired, must have been within six inches of his body. Lyman was also found to be suffering from a bruise on the left side of his forehead. When examined at the station house following his arrest, defendant exhibited extensive wounds over his mouth, eyes and face.

The evidence at the trial was in decided conflict. Doubtless both complainant and defendant had been drinking before the altercation occurred. From the testimony, a jury reasonably might have found that defendant, as he testified, fired the shots to obtain assistance in an attempt to arrest the complaining witness, and not with intent to inflict upon him bodily harm. On the other hand, they might have decided, as indeed they did, that the police officer willfully and without just cause, shot Lyman as he was leaving the bar and grill.

Upon this appeal defendant seeks a new trial urging that he was prejudiced because of a long succession of questions asked by the District Attorney concerning his record as a police officer. He also asserts that he was deprived of a fair trial because of the undue and excessive intervention by the trial court in direct and cross-examination of himself and other witnesses.

As to the claim made that the trial court prejudiced defendant's rights because of unnecessary interjection in the examination of witnesses, a reading of the record leads us to conclude that in nearly every instance the court's questions were designed

to clarify evidence already given or to test the accuracy of some of the testimony. For such purposes, the court could properly inquire. (*People* v. *Knapper,* 230 App. Div. 487, 489; *People* v. *Ferguson,* 199 App. Div. 642, 648, revd. on other grounds 234 N. Y. 159.) Though we find many separate interrogatories by the trial court, nowhere does defendant single out particular questions as having a prejudicial effect, nor have we been able to discover any. Indeed, at no point was an objection registered against any of the questions asked (*People* v. *Perrin,* 224 App. Div. 546, 550, affd. 251 N. Y. 509) nor is there any indication of partiality or prejudice stemming from questions propounded by the court. In a comprehensive charge, careful instructions were given to the jury to the effect that they were the sole and exclusive judges of the facts, and that they were not to infer from the court's asking questions that it had any opinion as to defendant's guilt or innocence. We are satisfied that no prejudice resulted from the court's allegedly undue participation in the trial.

We now come to the more serious issue as to whether the trial court erred in permitting detailed cross-examination of defendant on his record in the police department. Defendant testified as a witness in his own behalf. Over objection, the court permitted the prosecutor to ask a series of questions going back some twenty years relating to defendant's record while serving as a police officer. Some of the interrogatories were excluded, many others were allowed. We refer specifically to those which defendant was required to answer. He was asked whether on January 2, 1930, he had been absent from a relieving post and had spoken in an insolent manner to a superior officer; whether on September 29, 1931, he had an altercation with, and used indecent language to, another patrolman; whether on December 6, 1932, he was absent from post for twenty minutes, and whether he had an argument with a female while in a restaurant without permission, and whether he passed indecent remarks to the female, and unnecessarily placed the female under arrest and did convey her to the station house in a patrol wagon charging her with disorderly conduct; whether on February 25, 1936, he had failed to safeguard receipts of money in certain premises, and whether he was seated at a desk there in uniform apparently asleep; whether on August 14, 1936, he had used abusive language to a civilian and made disparaging remarks about judges while serving a summons; whether on July 23, 1948, while in civilian clothes, he had entered the home of a citizen and had demanded that the citizen shut off the radio in

his home, and thereafter unnecessarily arrested him, and whether he did " use insults and insubordinate language to a superior officer ". He was also asked whether on November 28, 1949, he had a fight in a bar and grill, as a result of which he was hospitalized, and whether on that occasion he failed to make an arrest; and whether between October, 1948, and March, 1949, he had " struck a little fellow called pushcart Joe in a bar and grill ". Defendant denied the truth of practically each one of the charges implied in the questions asked. He testified, too, that he had denied them all at the time they had originally been made. While he did admit having some difficulty on November 28, 1949, he gave an entirely different version of what had occurred than that contained in the question.

The cross-examination was permitted on the theory that the questions were appropriate for the purpose of testing defendant's credibility as a witness. Though the court instructed the jury that the District Attorney was bound by the answers of defendant and should draw no unfavorable inferences against defendant by virtue of the fact that these questions were being asked, we are of the opinion that prejudicial error was committed in permitting this persistent inquiry into defendant's alleged derelictions during his period of service as a police officer.

As concisely pointed out by Mr. Justice DENIS O'LEARY COHALAN at the Special Term in granting defendant a certificate of reasonable doubt (*People* v. *Bilanchuk,* 199 Misc. 871, 872–873) : " The questions asked came from a written record of the police department. In each instance the charge appearing in the record was denied by the defendant at the time the charge was made. An attack on credibility is a collateral matter. The cross-examiner is bound by the answer. Both the District Attorney and the Judge knew from the record not only the nature of the charges made but also the denials interposed by the defendant. It was reasonable to suppose that the same answers would be given by the defendant when the same questions were asked at this trial. After the first question was asked further procedure along this line could have been prevented had the Judge examined the record in the absence of the jury and ruled against the asking of the questions."

The rule is, of course, well settled that a defendant who takes the witness stand may, like any other witness, be cross-examined concerning any previous vicious, illegal or immoral act which he may have committed. (*People* v. *Sorge,* 301 N. Y. 198, 200; *People* v. *Johnston,* 228 N. Y. 332, 340; *People* v. *De Garmo,* 179 N. Y. 130, 134.) The manner and extent of the cross-

examination lies largely within the discretion of the trial judge. (*People* v. *Malkin,* 250 N. Y. 185, 197.) The offenses inquired about may be similar in nature and character to the crime for which the defendant is standing trial, and if the questions are asked in good faith they are not rendered improper merely because of their number. However, queries which do not fairly tend to impeach his credibility as a witness may not be allowed. (*People* v. *Flynn,* 275 App. Div. 350, 351.) '' As such witness he [defendant] may be impeached through the methods applicable to any witness. The impeachment is not for the purpose of showing that he was the kind of person who would be willing to commit the offense charged, but solely for the purpose of diagnosing his conscience and thereby enabling the jury to determine the extent of his veracity and credibility as a witness. Testimony which does not tend legitimately to discredit his evidence is irrelevant and should be excluded. (*People* v. *Hinksman,* 192 N. Y. 421.) '' (*People* v. *Richardson,* 222 N. Y. 103, 107.)

Allowing the prosecution, by questions, to read before the jury what appeared to be the entire police department report of defendant was obviously designed to, and had the effect of, establishing that defendant's record as a policeman was a very poor one. Many of the questions posed had a definite tendency to show that defendant had been neglectful and troublesome in his service as a police officer, but apart from the two questions asked about alleged assaults they did not involve illegal, vicious or immoral acts. That he may have used objectionable language to a fellow officer and to a civilian; that he may have made unnecessary arrests; and that he may at times have shown an aggressive disposition could not properly be asked to impeach his credibility as a witness. Other than the queries as to two claimed assaults, all were matters that had to do with his service as a police officer, and most of the charges, even if admitted to be true by defendant, would not have shown that he was guilty of immoral or criminal conduct.

The vigorous and perhaps overzealous cross-examination into his police record, as conducted here, had the effect of showing that defendant was of a pugnacious disposition, that he was disrespectful to his fellow policemen, that he used bad judgment in making arrests, and that he was the type of police officer who would abuse his office and who would commit the wanton assault with which he stood charged. Though the court instructed the jury that they were bound by defendant's denials, yet, under the law such questions '' may not be asked for the improper

purpose of planting in the minds of the jury suspicion and distrust by insinuations that the defendant has falsely denied his guilt as to collateral matters." (*People* v. *Slover,* 232 N. Y. 264, 268.) In *People* v. *Malkin* (250 N. Y. 185, 197, *supra*) former Chief Judge LEHMAN made the following apposite observation: " So, too, it is error of law to admit questions as to whether a witness has been expelled from a private or semi-public organization. (*Nolan* v. *Brooklyn City & Newtown R. R. Co.,* 87 N. Y. 63, 68.) True, it has been held in many cases that the error may be rendered immaterial by the nature of the answer. A denial interposed to such question may be, as matter of law, conclusive. Where, however, by innuendo or suggestion, attempt is made to lead the jury to believe that the denial is not conclusive; where questions are permitted which are calculated by suggestion of misconduct to prejudice the jury regardless of the answer given, then it may hardly be said that the error in permitting the questions is harmless."

We are persuaded that the refusal to exclude these inquiries, in the circumstances of this case, operated to the distinct prejudice of defendant's rights. The law " has set its face against the endeavor to fasten guilt upon a defendant by proof of character or experience predisposing to an act of crime ". (*People* v. *Zackowitz,* 254 N. Y. 192, 197; *People* v. *Mleczko,* 298 N. Y. 153, 159; *People* v. *Nuzzo,* 294 N. Y. 227, 234; *People* v. *Brown,* 265 App. Div. 153, 157, affd. 290 N. Y. 830.)

From a public standpoint it is most desirable that a police officer, sworn to protect the life and property of citizens of the community, who commits an unwarranted assault upon a citizen should be convicted and punished. However, it is of equal importance that the stigma of conviction, together with the grave consequences which follow, should not be visited upon a defendant unless he has been proven guilty at a fair trial free from substantial error. In this case, where the testimony was in such sharp contrast, we are of the view that the error committed deprived him of that fair trial.

The judgment should be reversed and a new trial ordered.

PECK, P. J., GLENNON, DORE and CALLAHAN, JJ., concur.

Judgment unanimously reversed and a new trial ordered.